## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| Roderick Roberson, Michael Hudson, Dylon White, Caleb Schmitt, Justin Berberich, Chris Ulrich, and Ron Collins, individually and on behalf of the proposed class, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| The Kansas City Southern Railway Co., | **(JURY TRIAL DEMANDED)** |
| Defendant. | |

## <u>INTRODUCTION</u>

1.      The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), allows eligible employees to take up to 12 workweeks of leave a year to care for themselves or their sick relatives. 29 U.S.C. § 2612(a)(1). This case is about an employer, Defendant The Kansas City Southern Railway Co. ("KCS"), that systematically deprives its employees of their FMLA leave by grossly miscalculating the amount of FMLA leave available to employees. Rather than giving employees 12 weeks of FMLA leave, KCS provides employees with as little as *12 days* of leave per year. Based on its flawed calculations, KCS falsely asserts that employees have exhausted their FMLA leave, then disciplines and terminates employees who take time off to meet their important family and medical needs—time off that should be protected under the FMLA. Employees who do manage to use FMLA leave are sent to the back of the line for new work assignments— impairing their ability to earn a living. Plaintiffs, current and former KCS employees who rely on the protections of the FMLA, bring this class action to put a stop to KCS's unlawful conduct.

1

2.      KCS is one of the largest railroads in the United States. It operates 24 hours a day, 7 days a week, 365 days a year. Plaintiffs and members of the proposed class work on or around trains, mainly as conductors and engineers. The number of hours they work each week varies. Train employees work on an on-call basis. Employees are either "marked up"—generally meaning they are on call and available for work—or "marked off"—meaning they are unavailable for work. But just because an employee is marked up does not mean he is working. It simply means he is on call and available for work. Eventually, an employee who is marked up will be called to perform work. Employees mark off for all sorts of reasons. They may take vacations, sick days, and personal days if and when KCS allows them. Employees may also mark off to take FMLA leave, if eligible to do so.

3.      The principal issue in this case involves the manner in which KCS calculates and depletes employees' FMLA entitlement. That issue reduces down to a single overarching question: When a KCS employee needs to mark off, removing himself from KCS's on-call system, for a period of *X hours* to take FMLA leave, how many *workweeks* of FMLA leave (out of the total statutory annual allotment of 12 weeks) does he use?

4.      The FMLA and Department of Labor regulations provide the answer. *See generally* 29 U.S.C. § 2612(a)(1); 29 C.F.R. § 825.205. Because Plaintiffs and class members work variable and irregular schedules, KCS must base their FMLA-leave entitlement—i.e., the total amount of FMLA leave employees are entitled to—on the amount of time in the prior year that they worked *plus* the amount of time that they *would have worked* during that period but for taking leave of any type. *See* 29 C.F.R. § 825.205(b)(3) (directing employers to derive employees' leave entitlement based on "a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (*including any hours for which the employee took leave of any type*)" (emphasis

2

added)). In other words, when determining how much FMLA leave each Plaintiff and class member should receive, KCS must base the employee's leave entitlement on two things: the amount of time in the prior year the employee worked and the amount of work time the employee missed because of taking leave during that period. *Id.*

5. The FMLA also instructs KCS and other employers how to calculate how much FMLA leave an employee uses—i.e., the amount of time to deduct from that employee's total FMLA-leave allowance when he takes leave. To begin with, KCS may not require employees to take more FMLA leave than necessary, and it must let employees take FMLA leave in increments of no more than one hour. 29 C.F.R. § 825.205(a)(1). In addition, KCS must count employees as using an amount of FMLA leave in direct proportion to the amount of work they miss because of leave in each workweek—with each employee's standard workweek providing the baseline to measure this. *Id.* § 825.205(b)(1), (c). Time that an employee is not scheduled to report for work may not be counted as FMLA leave. "[O]nly the amount of leave actually taken may be counted toward the employee's leave entitlement." *Id.* § 825.205(b)(1). Were it otherwise, KCS could end up reducing the employee's FMLA leave entitlement "beyond the amount of leave actually taken." 29 U.S.C. § 2612(b)(1); *see* 29 C.F.R. § 825.205(b)(1). When an employee who works variable hours takes FMLA leave, the amount of leave that employee takes may be calculated either as a fraction of that employee's workweek or as its hourly equivalent. 29 C.F.R. § 825.205(b)(1). But if that fraction is converted into hours, the conversion must "equitably reflect[] the employee's total normally scheduled hours." *Id.* Finally, KCS may deduct no more than one workweek's worth of leave for each week that an employee uses FMLA leave. *See id.*

6. In late 2021, KCS completely revamped its method of calculating FMLA leave. KCS's new methodology badly miscalculates both the amount of FMLA leave available to eligible

3

employees and the amount of leave taken by those employees. KCS's methodology is faulty in several ways. But at bottom what it does is undercount the leave employees have available to them and overcharge employees for the leave they take. This undercounting and overcharging leads to an obvious—and unlawful—result: KCS claims that employees have exhausted their FMLA leave long before they have in fact done so.

7.       Here is what KCS does when an employee requests FMLA leave. First, KCS calculates the total amount of FMLA leave to which it claims that employee is entitled. KCS does this by determining what it claims is the number of hours the employee actually worked in the prior year. *See, e.g.*, Roberson Decl. Ex. A; Hudson Decl. Exs. B, E; Schmitt Decl. Ex. D; Berberich Decl. Ex. A; Prewitt Decl. ¶ 6. Next, KCS multiples this number by 12 (for 12 weeks) and divides it by 52 (for 52 weeks in a year). *Id.* This calculation is meant to determine the amount of time the employee worked, on average, in any given 12-week period in the prior year. *Id.* The resulting number represents KCS's determination of the total amount of FMLA leave that the employee has available. So, for example, if KCS determines that employee Smith worked 1,600 hours in the prior year, Smith would have approximately 369 hours (1600 x (12/52)) available to use for FMLA leave. A week's worth of FMLA leave for Smith, then, comes out to roughly 30.75 hours (369 / 12 = 30.75)—the average amount of time KCS claims Smith works each week (1,600 / 52).

8.       Second, after calculating an employee's total FMLA-leave allowance, KCS determines the amount of leave that employee has left to take, if any. KCS does this—and this is the critical step—by depleting the total hours of FMLA leave available to the employee by *the total amount of time the employee has marked off for FMLA leave*. *See, e.g.*, Hudson Decl. Ex. D; Schmitt Decl. Ex. C; Berberich Decl. Ex. A; Prewitt Decl. ¶ 6. So, if the same employee Smith

4

marks off for FMLA leave for two calendar days, spanning 48 hours, KCS reduces his available FMLA leave by 48 hours (from 369 to 321). What KCS is doing here is *allotting FMLA leave* based on the average hours employees work, but *depleting FMLA leave* based on the *total clock hours* employees are on leave. So according to KCS, Smith—an employee who works an average of about 30 hours per week—has somehow used up more than a *week and a half* of FMLA leave by taking off two days. Another 14 days and Smith will be out of FMLA leave altogether for the whole year (24 x 14 = 336). Once employees' allotted hours are completely depleted, KCS does not allow them to take additional FMLA leave.

9.      KCS's methodology for calculating FMLA leave is both wrong and illegal, for at least four reasons. First, by determining the number of hours available for FMLA leave by reference to employees' *actual hours worked*, but depleting that leave entitlement using employees' *total time marked off and unavailable for work*, KCS provides employees with only a small fraction of their 12 weeks of statutory leave. Think of it this way. Suppose that an employee works a standard 40-hour week and takes FMLA leave for 24 hours, covering a single 8-hour shift. He should be charged with using one-fifth of a week of FMLA leave (8 hours out of 40). 29 C.F.R. § 825.205(b)(1), (c). Or, alternatively, with using 8 hours of FMLA leave. *See id.* § 825.205(b)(1) (providing that employers may convert "these fractions to their hourly equivalent so long as the conversion equitably reflects the employee's total normally scheduled hours"). But KCS's methodology effectively counts that employee as having used *24 hours*, or *3/5 or 0.6 weeks*, *of FMLA leave* (calculated as 24/40). The key to the bad math is an impermissible apples-to-oranges comparison in converting hours to weeks: treating average *work hours* as the relevant denominator, but *total hours marked off* as the numerator.

10.     KCS does not treat time employees spend marked up and waiting on the on-call list as time spent working. Collins Decl. ¶ 4; Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; White Decl. ¶ 4. It does not pay employees for this time. Collins Decl. ¶ 4; Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; White Decl. ¶ 4. It does not include this time in determining how many hours an employee worked in the previous year. Nor does it include this time in determining an employee's FMLA-leave allowance. Yet KCS treats *every hour of time marked off* to take FMLA leave as an hour of FMLA leave, even though much of this time would not—and legally could not[1]—have been spent working.

11.     This flawed methodology—in which KCS deducts all time marked off for FMLA leave from employees' leave entitlement, but includes only actual time worked when calculating that entitlement—leads to outrageous results. One example throws these abstract points into sharp relief: Plaintiff Caleb Schmitt marked off for FMLA leave for a 72-hour stretch spanning exactly three days in July 2021. Schmitt Decl. Ex. C. KCS claimed that Schmitt worked, on average, 24 hours per week during the prior year. Schmitt Decl. Ex. D. Using the flawed methodology described in the previous paragraphs, KCS considered this single 3-day, 72-hour, period to be *three weeks* of FMLA leave.[2] *Id.* But to state the obvious: an employee who misses work for a single three-day period does not use *three weeks* of FMLA leave—or anything close to it. KCS's FMLA

---

[1] Congress has set strict limits on the amount of time train employees can work, generally limiting them to working no more than 12 hours in a row and providing at least 10 hours off between shifts. *See* 49 U.S.C. § 21103(a).

[2] KCS's methodology here was as follows: it claimed Schmitt worked 1,254 hours during the prior 12-month period. Schmitt Decl. Ex. D. Multiplying that number by 12 (for weeks of FMLA leave required under the statute) and dividing by 52 (for weeks in the year) yields a total of 289 hours of eligible FMLA leave. *Id.* KCS then charged Schmitt with using 72 hours of leave—nearly one quarter of his total FMLA leave allotment (of 289 hours) for the entire year. Schmitt Decl. Ex. C. One quarter of 12 weeks is 3 weeks.

policy falls laughably short of the FMLA's 12-week requirement. Again, using Plaintiff Schmitt as an example, KCS would consider a single period of leave lasting a little more than 12 days to deplete Schmitt's FMLA entitlement for the *entire year*.[3] To again state the obvious: 12 days is not 12 weeks.

12.     KCS's miscalculations don't end there. The company overcharges employees for the leave employees take in a second way, too. The FMLA and its implementing regulations require employers to allow employees to use FMLA leave in the smallest increment of time the employer allows for other forms of leave—such as vacation time—as long as that increment is no longer than one hour. *See* 29 C.F.R. § 825.205(a). The basic point of this rule is straightforward: employers may not require employees who need FMLA leave to take more FMLA leave than necessary. *Id.*

13.     KCS does not comply with this rule. It does not allow employees to take FMLA leave in increments of one hour. Prewitt Decl. ¶ 5; White Decl. ¶ 5; Berberich Decl. ¶ 5. And KCS often forces employees to mark off for far more FMLA leave than they need. KCS generally requires employees to initially mark off for a minimum of 24 hours. Prewitt Decl. ¶ 5; White Decl. ¶ 5; Berberich Decl. ¶ 5. Although KCS may allow employees to mark up before the 24 hours are complete, that is not guaranteed; it is KCS—not the employee—that decides whether the employee can return to work in less than 24 hours. Prewitt Decl. ¶ 5; White Decl. ¶ 5; Berberich Decl. ¶ 5. When KCS's unlawful practice of forcing employees to take more leave than they need is combined with its policy of calculating employees' FMLA leave by reference to the total clock

---

[3] As detailed in the prior footnote, KCS calculated that Schmitt was entitled to 289 hours of leave per year. Depleting those hours at a rate of 24 hours a day yields a leave period of 12.05 days.

hours they mark off for that leave, these policies and practices work together to rapidly—and unlawfully—deplete the hours of FMLA leave available to employees.

14.      The problems don't end there. KCS shrinks its employees' entitlement to 12 weeks of leave in two more ways yet. But unlike KCS's first two errors, which violate the FMLA by unlawfully depleting the FMLA time that its employees have in the bank, these two additional errors violate the Act by failing to accurately count all the leave time that employees should have in the bank in the first place.

15.      First, KCS fails to allot all the leave that employees are entitled to receive by failing to account for prior periods of leave. Recall that employers must base employees' FMLA-leave entitlement on the amount of time in the prior year that employees actually worked *plus* the amount of time that they *would have worked* but for taking leave of any type. *See* 29 C.F.R. § 825.205(b)(1), (3). These regulations ensure that an employer's calculation of an employee's FMLA-leave allowance is based on the equivalent of a *standard week of work* (i.e., a week where no leave is taken), as opposed to a week diluted by various forms of leave that employee took over the prior year. To do otherwise would reduce the amount of leave to which that employee is entitled.

16.      If this feels abstract, think of it this way: a 40-hour-a-week employee who misses a single 8-hour shift uses 0.2 weeks of FMLA leave. That remains true even if this same employee took 4 weeks of vacation, 2 weeks of sick leave, and 2 weeks of FMLA leave in the prior year. Failing to account for those 8 weeks of leave for purposes of determining that employee's FMLA-leave allowance would yield the mistaken conclusion that a single missed 8-hour shift counts as

8

0.24 weeks of leave, not 0.2 weeks.[4] The FMLA ensures that this does not happen. And it does so by requiring employers to include both the hours an employee works and the amount of work an employee missed because of leave that employee has taken when calculating that employee's FMLA-leave entitlement.

17.    KCS does not do this. In determining the total number of hours of leave available for employees, KCS looks exclusively to the total number of hours each employee allegedly worked in the prior year. Roberson Decl. Ex. A; Hudson Decl. Exs. B, E; Schmitt Decl. Ex. D; Berberich Decl. Ex. A. KCS does not include hours that employees would have worked but for taking leave of any type. Roberson Decl. Ex. A; Hudson Decl. Exs. B, E; Schmitt Decl. Ex. D; Berberich Decl. Ex. A. In other words, KCS does not account for any hours of leave—FMLA or otherwise—that employees took during the prior year when determining how much FMLA leave employees are entitled to.

18.    Second, there is reason to believe that KCS also substantially underestimates the amount of time its employees spend working. When measuring how much employees work, employers must follow the "principles established under the Fair Labor Standards Act (FLSA) for determining compensable hours of work." 29 C.F.R. § 825.110(c). KCS employees, Plaintiffs among them, often work more than 40 hours a week. Yet KCS's estimates suspiciously claim that Plaintiffs worked closer to an average of 30 or even 20 hours per week. Roberson Decl. Ex. A; Hudson Decl. Ex. E; Schmitt Decl. Ex. D; Berberich Decl. Ex. A. These lowball estimates further deflate the amount of FMLA leave available to employees. Hudson Decl. ¶ 9.

---

[4] An employee who customarily works 40 hours a week when not on leave but who misses 8 weeks of work works approximately 33.8 hours per week if the leave periods are included when calculating the employee's average weekly hours ((44 x 40) / 52). Eight hours (the number of hours missed from a single day of FMLA leave in the hypothetical above) divided by 33.8 equals approximately .24.

19.     In addition to miscalculating the amount of FMLA leave available to its employees, KCS also punishes employees who take FMLA leave. When employees mark off for FMLA leave, they are removed from the on-call list. Prewitt Decl. ¶ 5. Once the period of FMLA leave is over, employees are marked back up and placed at the bottom of the on-call list. *Id.* In this way, employees who use FMLA leave effectively lose their place in line. *Id.* This policy of moving employees who take FMLA leave to the bottom of the on-call list has the effect of substantially reducing the hours of work—and thus the take-home pay—for employees who take FMLA leave. *Id.*

20.     KCS's policies work together to ensure that employees are allotted fewer hours of annual FMLA leave than they should receive, that any leave employees take is overcounted by several orders of magnitude against that original (and already flawed) allotment, and that employees' opportunity to work upon returning from leave is diminished.

21.     As a result of these unlawful policies and practices, a significant number of KCS's employees have been prohibited from taking the FMLA leave to which they are entitled under the Act. *See, e.g.*, Roberson Decl. ¶ 9, Ex. A; Hudson Decl. ¶¶ 8-9. Ex. A; White Decl. ¶ 8, Exs. A, B; Schmitt Decl. ¶ 8, Exs. A, B; Berberich Decl. ¶ 8, Ex. A; Ulrich Decl. ¶ 9, Exs. B, C; Collins Decl. ¶ 8; Prewitt Decl. ¶ 8. Based on its badly flawed methodology for calculating FMLA leave, KCS declares that employees have exhausted their leave long before they have in fact exhausted it. KCS then wrongly denies employees' requests for FMLA leave. That puts employees who should be able to take FMLA leave in an impossible bind: they are forced to work through serious illnesses, made to miss out on the opportunity to form meaningful early experiences with their newborn children, and required to choose between caring for their sick loved ones and losing their jobs. *See, e.g.*, Roberson Decl. ¶¶ 3, 10; Hudson Decl. ¶¶ 3, 10; White Decl. ¶¶ 3, 10; Schmitt Decl. ¶¶ 3, 10;

10

Berberich Decl. ¶¶ 3, 10; Ulrich Decl. ¶¶ 3, 12; Collins Decl. ¶¶ 3, 9; Prewitt Decl. ¶ 8. Employees who are forced to mark off as sick or for personal reasons—that is, employees who miss work after KCS claims that their FMLA leave has been exhausted—are promptly disciplined and eventually terminated by KCS. Roberson Decl. ¶ 10; Hudson Decl. ¶ 10; White Decl. ¶ 10; Schmitt Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 10; Collins Decl. ¶ 10.

22.     KCS's violations of the FMLA are willful and ongoing. Employees and their union representatives have pointed out the illegalities in KCS's new calculation methodology. Roberson Decl. ¶ 10; Hudson Decl. ¶ 10; White Decl. ¶ 10; Schmitt Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 12; Collins Decl. ¶ 9; Prewitt Decl. ¶ 9; Exhibit A. But KCS refuses to change course. KCS persists in its unlawful course because it has a strong financial incentive to miscalculate employees' FMLA leave. Complying with the FMLA requires KCS to bear the costs of retaining a larger number of employees. It also requires KCS to employ workers who have ongoing—but manageable—medical and family needs. Perhaps KCS would simply prefer to employ only workers who don't need to take FMLA leave. But it cannot do that. By disregarding the FMLA's clear mandate, KCS has saved significant sums of money.

23.     The human costs of KCS's misconduct, however, are incalculable. KCS has shortchanged U.S. military combat veterans needing urgent medical care; parents seeking to care for their special-needs children; husbands trying to take care of seriously ailing spouses; and employees who now must work in excruciating pain or risk losing their livelihoods. *See, e.g.*, Roberson Decl. ¶¶ 3, 10; Hudson Decl. ¶¶ 3, 10; White Decl. ¶¶ 3, 10; Schmitt Decl. ¶¶ 3, 10; Berberich Decl. ¶¶ 3, 10; Ulrich Decl. ¶¶ 3, 12; Collins Decl. ¶¶ 3, 9; Prewitt Decl. ¶ 8.

24.     This is not what Congress had in mind when it granted workers up to 12 weeks of protected medical and family leave. Plaintiffs ask this Court to reaffirm that 12 weeks means 12 weeks. And they ask this Court to grant all appropriate relief to remedy KCS's unlawful conduct.

## PARTIES

25.     Plaintiff Roderick Roberson is an engineer who has worked for KCS for 17 years. Roberson Decl. ¶ 2. He resides in Bossier City, Louisiana. *Id.*

26.     Plaintiff Michael Hudson is an engineer who has worked for KCS for 19 years. Hudson Decl. ¶ 2. He resides in Mulberry, Kansas. *Id.*

27.     Plaintiff Dylon White is an engineer who has worked for KCS for eight years. White Decl. ¶ 2. He resides in Bossier City, Louisiana. *Id.*

28.     Plaintiff Caleb Schmitt is a conductor who has worked for KCS for eight years. Schmitt Decl. ¶ 2. He resides in Rich Hill, Missouri. *Id.*

29.     Plaintiff Justin Berberich is a conductor who has worked for KCS for 16 years. Berberich Decl. ¶ 2. He resides in Pittsburg, Kansas. *Id.*

30.     Plaintiff Chris Ulrich is an engineer who has worked for KCS for 24 years. Ulrich Decl. ¶ 2. He resides in Liberal, Missouri. *Id.*

31.     Plaintiff Ron Collins is an engineer who has worked for KCS for 18 years. Collins Decl. ¶ 2. He resides in Girard, Kansas. *Id.*

32.     Defendant KCS is one of seven Class I railroads—the largest freight rail operators in the United States. Prewitt Decl. ¶ 3. KCS is headquartered in Kansas City, Missouri. KCS provides freight rail transportation services across much of the United States and Mexico. *Id.*

## JURISDICTION AND VENUE

33.     This Court has original jurisdiction over this lawsuit under 28 U.S.C. § 1331.

34.     Venue is proper under 28 U.S.C. § 1391 because KCS is headquartered in this district and the illegal conduct occurred in this district. Under Local Rule 3.2(a) and (b), this case arose in the Western Division because KCS is headquartered in Jackson County and Plaintiffs' claims for relief arose in the same Division.

## FACTUAL ALLEGATIONS

### KCS'S ON-CALL WORK SYSTEM

35.     This case requires a basic understanding of KCS's on-call work system. KCS operates 24 hours a day, 7 days a week, 365 days a year. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4. That means KCS's employees may be called to perform work at any time of day (or night) on any day of the year.

36.     Plaintiffs and members of the proposed class work on trains as conductors and engineers, and in other similar positions. *See* Roberson Decl. ¶ 2; Hudson Decl. ¶ 2; White Decl. ¶ 2; Schmitt Decl. ¶ 2; Berberich Decl. ¶ 2; Ulrich Decl. ¶ 2; Collins Decl. ¶ 2; Prewitt Decl. ¶ 2.

37.     KCS's train employees work on an on-call basis. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4. KCS uses a crew management system to staff its trains. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4. The crew management group tracks the status of all KCS train employees. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4. Broadly speaking, within the crew management system, employees are either "marked up"—meaning they are available for work—or "marked off"—meaning they are unavailable for work. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4;

White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4.

38.     Plaintiffs' declarations explain how KCS's on-call process works. Roberson Decl. ¶ 4-5; Hudson Decl. ¶ 4-5; White Decl. ¶ 4-5; Schmitt Decl. ¶ 4-5; Berberich Decl. ¶ 4-5; Ulrich Decl. ¶ 5-6; Collins Decl. ¶ 4; *see also* Prewitt Decl. ¶ 4. As these declarations illustrate, an employee who is marked up is placed on a list of marked-up employees. As work becomes available, a KCS agent calls the employee at the top of the list and tells him to report to work. These calls can come at any time: during the day or night; during the week, on weekends, or on holidays. When employees receive these calls, they must report for duty within two hours. Failing to do so results in serious discipline and can lead to termination. After the work is complete and the employee is eligible to mark up again, he is added to the bottom of the list. Employees who are marked up therefore move up the list until they are eventually called into work.

39.     Employees mark off, making them unavailable for work, for a variety of reasons. To mark off, an employee calls the KCS crew management team and tells the agent who answers the phone: (1) how long he needs to mark off; and (2) why he needs to mark off. KCS tracks the reason for the mark off through a system of codes.

40.     Employees may mark off to take vacations, sick days, and personal leave days if and when KCS allows them (or if provided through a collective bargaining agreement). But marking off sick or for personal leave is fraught with danger for employees. *See* Roberson Decl. ¶ 5; Hudson Decl. ¶ 5; White Decl. ¶ 5; Schmitt Decl. ¶ 5; Berberich Decl. ¶ 5; Ulrich Decl. ¶ 6; Collins Decl. ¶ 5; Prewitt Decl. ¶ 5. KCS does not give its employees a set number of sick or personal leave days. Roberson Decl. ¶ 5; Hudson Decl. ¶ 5; White Decl. ¶ 5; Schmitt Decl. ¶ 5; Berberich Decl. ¶ 5; Ulrich Decl. ¶ 6; Collins Decl. ¶ 5; Prewitt Decl. ¶ 5. If KCS determines, in

its discretion, that an employee's use of sick or personal leave days is "excessive," KCS will discipline the employee. Roberson Decl. ¶¶ 5, 10; Hudson Decl. ¶¶ 5, 10; White Decl. ¶¶ 5, 10; Schmitt Decl. ¶¶ 5, 10; Berberich Decl. ¶¶ 5, 10; Ulrich Decl. ¶¶ 5, 12; Collins Decl. ¶¶ 5, 9; Prewitt Decl. ¶¶ 5, 7-8. Progressive discipline can lead to termination. Roberson Decl. ¶¶ 5, 10; Hudson Decl. ¶¶ 5, 10; White Decl. ¶¶ 5, 10; Schmitt Decl. ¶¶ 5, 10; Berberich Decl. ¶¶ 5, 10; Ulrich Decl. ¶¶ 5, 12; Collins Decl. ¶¶ 5, 9; Prewitt Decl. ¶¶ 5, 7-8.

41.     Employees may also mark off to take FMLA leave, if eligible to do so. Roberson Decl. ¶ 5; Hudson Decl. ¶ 5; White Decl. ¶ 5; Schmitt Decl. ¶ 5; Berberich Decl. ¶ 5; Ulrich Decl. ¶ 6; Collins Decl. ¶ 5; Prewitt Decl. ¶ 5. FMLA leave comes in many shapes and sizes. Employees mark off for anticipated events, like the birth or adoption of a child or a planned medical procedure. *E.g.*, White Decl. ¶¶ 3, 10; Schmitt Decl. ¶¶ 3, 10 -11; Prewitt Decl. ¶ 8. Some employees mark off intermittently—for example, when they need regular medical treatment or experience an acute period of illness from a pre-existing condition. *E.g.*, Roberson Decl. ¶¶ 3, 10; Hudson Decl. ¶¶ 3, 10; Schmitt Decl. ¶¶ 3, 10; Berberich Decl. ¶¶ 3, 10; Ulrich Decl. ¶¶ 4, 12; Collins Decl. ¶¶ 3, 9. And, of course, employees take FMLA leave from time to time to deal with unanticipated medical emergencies. *See, e.g.*, White Decl. ¶ 10 (explaining need for leave for suspected COVID-19).

42.     When employees mark off for FMLA leave, they are removed from the on-call list. Prewitt Decl. ¶ 5. Once the period of FMLA leave is over, employees are marked back up and placed at the bottom of the on-call list. *Id.* In this way, employees who use FMLA leave effectively lose their place in line. *Id.* This policy of moving employees who take FMLA leave to the bottom of the on-call list has an actual and substantial effect of reducing the hours of work—and thus the take-home pay—for employees who take FMLA leave. *Id.*

43.     Congress has set strict limits on the amount of time train employees can work. Train employees are not allowed to work more than 276 hours in a month. 49 U.S.C. § 21103(a)(1). They cannot work more than 12 consecutive hours. *Id.* § 21103(a)(2). Nor can they begin a shift until they have had at least 10 consecutive hours off duty within the past 24 hours. *Id.* § 21103(a)(3). Federal law similarly requires mandatory rest periods (of 48 or 72 hours, depending on the circumstances) if the employee has worked on six or seven consecutive days. *Id.* § 21103(a)(4).[5]

44.     Unless they mark off for some unrelated reason, KCS employees remain marked up during mandatory rest periods. Roberson Decl. ¶ 4; Hudson Decl. ¶¶ 4-5; White Decl. ¶¶ 4-5; Schmitt Decl. ¶¶ 4-5; Berberich Decl. ¶¶ 4-5; Ulrich Decl. ¶¶ 5-6; Collins Decl. ¶¶ 4-5; Prewitt Decl. ¶¶ 4-5. This means that marked up employees move up the on-call list during mandatory rest periods. Hudson Decl. ¶ 5; White Decl. ¶ 5; Schmitt Decl. ¶ 5; Berberich Decl. ¶ 5; Ulrich Decl. ¶ 6; Collins Decl. ¶ 5; Prewitt Decl. ¶ 5. KCS does not call these employees to work—regardless of their position on the on-call list—until these mandatory rest periods are over. Roberson Decl. ¶ 4; Hudson Decl. ¶¶ 4-5; White Decl. ¶¶ 4-5; Schmitt Decl. ¶¶ 4-5; Berberich Decl. ¶¶ 4-5; Ulrich Decl. ¶¶ 5-6; Collins Decl. ¶¶ 4-5; Prewitt Decl. ¶¶ 4-5. Once the rest periods end, these employees will be called to work based on their position on the on-call list. Roberson Decl. ¶ 4; Hudson Decl. ¶ 4; White Decl. ¶ 4; Schmitt Decl. ¶ 4; Berberich Decl. ¶ 4; Ulrich Decl. ¶ 5; Collins Decl. ¶ 4; Prewitt Decl. ¶ 4.

## KCS MAINTAINS A POINTS-BASED DISCIPLINARY POLICY

---

[5] A separate provision allows train employees to "remain or go on duty for not more than 4 additional hours" than otherwise allowed in certain emergency situations. *Id.* § 21103(d).

45.     KCS maintains a points-based disciplinary policy. Prewitt Decl. ¶ 7. Broadly, under KCS's rules, employees are assigned points for various workplace attendance infractions. *Id.* The number of points depends on the seriousness of the infraction—with less serious offenses worth fewer points and more serious offenses worth more. *Id.* When an employee accrues five points, he faces investigation and termination. *Id.* Points fall off an employee's record after three years. *Id.*

46.     Most relevant here, KCS does not (and under the law, cannot) assess points against employees who mark off to use FMLA leave. But it's another story for employees who have supposedly exhausted their FMLA leave. When these employees need to mark off for periods that otherwise would be covered by the FMLA, they simply mark off as "sick" or for "family emergency" or unpaid "personal leave." Roberson Decl. ¶¶ 5, 10; Hudson Decl. ¶¶ 5, 10; White Decl. ¶¶ 5, 10; Schmitt Decl. ¶¶ 5, 10; Berberich Decl. ¶¶ 5, 10; Ulrich Decl. ¶¶ 6, 12; Collins Decl. ¶¶ 5, 9; Prewitt Decl. ¶¶ 5, 7-8. KCS will assess points—typically two points—against any employee whom KCS deems to have marked off "sick" or for "family emergency" or unpaid "personal leave" an excessive amount. Prewitt Decl. ¶ 7. But KCS does not define "excessive." *Id.* And employees are routinely assessed points for modest or infrequent "sick," "family emergency," or unpaid "personal leave" mark-offs. *Id.* In railroad jargon, employees are expected to "protect their job"—meaning KCS expects employees to be marked up and ready to work more or less continuously. Hudson Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 12; Prewitt Decl. ¶ 7.

## KCS'S EMPLOYEES RELY ON THE FMLA

47.     KCS employs thousands of people, many of whom rely on the FMLA. Prewitt Decl. ¶ 7. The Plaintiffs in this case are no exception. They are, and have long been, eligible and approved to take FMLA leave. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 3; Collins Decl. ¶ 3. Before revamping its

17

methodology for calculating employees' leave in late 2021, KCS had consistently approved Plaintiffs' requests for FMLA leave to attend to their and their families' serious health needs. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 4; Collins Decl. ¶ 3. Plaintiffs rely and have long relied on KCS's approval of FMLA leave to ensure their time off is protected by the law. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 4; Collins Decl. ¶ 3. Plaintiffs intend to continue to use FMLA leave for their qualifying medical and family needs in the future. Roberson Decl. ¶ 11; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 11; Ulrich Decl. ¶ 13; Collins Decl. ¶ 10.

48.     Plaintiff Roderick Roberson was twice deployed to Iraq while serving in the U.S. military. Roberson Decl. ¶ 3. He suffered a shoulder injury in combat. *Id.* He uses FMLA leave to address the ongoing physical and mental toll stemming from these injuries. *Id.* ¶¶ 3, 10.

49.     Plaintiff Michael Hudson uses FMLA leave to address severe and debilitating migraine headaches. Hudson Decl. ¶¶ 3, 10.

50.     Plaintiff Dylon White uses FMLA leave to care for his sick spouse and daughter and to attend to his own infrequent medical needs. White Decl. ¶¶ 3, 10. With three children at home (and a fourth on the way), his ability to help his ailing spouse and children when needed is critical. *Id.* White will also soon need FMLA leave when his next child arrives. *Id.*

51.     Plaintiff Caleb Schmitt uses FMLA leave to manage his ulcerative colitis, a condition that, when it flares up, makes working on a train close to impossible. Schmitt Decl. ¶¶ 3, 10.

52. Plaintiff Justin Berberich, like Hudson, uses FMLA leave to manage severe migraine headaches. Berberich Decl. ¶¶ 3, 10. He also relies on the FMLA to help care for his elderly parents. *Id.*

53. Plaintiff Chris Ulrich uses FMLA leave to manage his pancreatitis and gout. Ulrich Decl. ¶¶ 4, 12.

54. Plaintiff Ron Collins has kidney stones and has needed kidney surgery. He uses FMLA leave to manage these medical conditions. Collins Decl. ¶¶ 3, 9.

55. Plaintiffs are broadly representative of KCS's employees. These employees (including class members) rely on the FMLA to address serious and important medical- and family-care issues. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 4; Collins Decl. ¶ 3.

## KCS ADOPTS A NEW FMLA CALCULATION PLAN IN LATE 2021

56. In the late months of 2021, KCS implemented a completely revamped method of calculating FMLA leave. Prewitt Decl. ¶ 6. This new policy radically changed the amount of FMLA leave available to employees. *Id.* Many employees who had successfully used FMLA leave for years without ever exhausting their leave were suddenly told that their leave had been exhausted and were denied leave. Roberson Decl. ¶¶ 3, 8-9; Hudson Decl. ¶¶ 3, 8-9; White Decl. ¶¶ 3, 8-9; Schmitt Decl. ¶¶ 3, 8-9; Berberich Decl. ¶¶ 3, 9; Ulrich Decl. ¶¶ 4, 9; Collins Decl. ¶¶ 3, 8-9. This was the case even though these employees had been using no more FMLA leave than they had used in previous years. Roberson Decl. ¶ 3; Hudson Decl. ¶¶ 3, 9; White Decl. ¶¶ 3, 9; Schmitt Decl. ¶¶ 3, 9; Berberich Decl. ¶¶ 3, 9; Ulrich Decl. ¶¶ 4, 9; Collins Decl. ¶¶ 3, 8.

57. Beginning in late 2021 and continuing to the present, many KCS employees (including all Plaintiffs) have received notices from KCS claiming that their FMLA leave

allotment has been exhausted. Roberson Decl. ¶ 8; Hudson Decl. ¶ 8; White Decl. ¶ 8; Schmitt Decl. ¶ 8; Berberich Decl. ¶ 9; Ulrich Decl. ¶ 9; Collins Decl. ¶ 8. These letters, all virtually identical, contain no math or reasoning whatsoever. They simply tell employees: "**[Y]ou have now exhausted your FMLA leave entitlement** for the previous rolling 12-month period." Hudson Decl. Ex. A; White Decl. Ex. B; Schmitt Decl. Ex. B; Ulrich Decl. Ex. C.

58.     Naturally, employees have been asking KCS to show its work. In response to these inquiries, KCS's Senior Leave Administrator, Jill Byers, sent many employees letters—again all virtually identical—explaining KCS's methodology. Roberson Decl. Ex. A; Hudson Decl. Exs. B, E; Schmitt Decl. Ex. D; Berberich Decl. Ex. A. As Byers explained in the letters, KCS first determines what it claims is the number of hours that the employee worked in the prior 12-month period. Next, KCS multiples this number by 12 (for 12 weeks) and divides it by 52 (for 52 weeks in a year). This calculation is meant to determine the amount of time the employee worked, on average, in any given 12-week period in the prior year. The resulting number represents the total amount of time the employee has available to take FMLA leave. Last, KCS depletes the hours of FMLA leave available to employees by the total amount of time employees are marked off for FMLA leave. Employees' total allotment of FMLA leave is depleted cumulatively based on the total amount of FMLA leave they have taken in the prior 12-month period.

59.     Take Plaintiff Justin Berberich as an example. KCS determined that Berberich worked 1,606.5 hours in the prior 12-month period, which worked out to be an average of 30.9 hours per week. Berberich Decl. Ex. A. Multiplying 1,606.5 by 12 and dividing by 52 yielded 371 hours[6] of total FMLA leave available to Berberich. Byers then claimed that Berberich had already taken 613.6 hours of FMLA leave in the prior 12-month window—exceeding his 371-hour

---

[6] The actual number is approximately 370.73, but Byers rounded up.

allotment. But as evidence for this last assertion, Byers attached a spreadsheet showing the *total amount of time* Berberich had *marked off* for FMLA leave in the past 12 months:

| EMPLOYEE | LAYOFF DT | LAYOFF TM | DURATION HRS | DURATION MIN | STATUS | REASON | Name |
|---|---|---|---|---|---|---|---|
| 000074369 | 9/6/2021 | 1:39 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 7/31/2021 | 11:28 | 48 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 8/6/2021 | 5:31 | 48 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 8/20/2021 | 6:55 | 48 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 8/28/2021 | 0:13 | 34 | 14 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 8/29/2021 | 17:47 | 13 | 25 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 9/10/2021 | 18:11 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 9/17/2021 | 11:34 | 48 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 9/24/2021 | 20:24 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 10/2/2021 | 10:57 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 10/3/2021 | 15:13 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 10/16/2021 | 21:16 | 10 | 5 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 11/6/2021 | 0:37 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 11/19/2021 | 8:21 | 14 | 52 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 1/7/2022 | 17:53 | 14 | 18 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 1/21/2022 | 9:09 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 2/4/2022 | 8:41 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 8/12/2021 | 0:37 | 48 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 9/28/2021 | 20:05 | 14 | 55 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 11/9/2021 | 0:22 | 12 | 15 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 12/1/2021 | 23:20 | 12 | 3 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 12/9/2021 | 21:56 | 12 | 29 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 1/19/2022 | 18:01 | 24 | 0 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| 000074369 | 1/26/2022 | 18:59 | 18 | 58 | LV | IS | BERBERICH, JUSTIN MICHAEL |
| | | | **609** | **274** | | **TOTAL** | **613.6 hours** |

KCS thus determined Berberich's FMLA-leave allotment based on the number of hours KCS claims that Berberich actually worked, but depleted that allotment based on the *total clock hours* he marked off for FMLA leave.

      60.     A close look at the spreadsheet Byers sent Berberich reveals the flaws in KCS's calculations. Berberich took FMLA leave 24 times. According to KCS, more than half of the leave Berberich took was either in chunks of exactly 24 hours (nine times) or exactly 48 hours (five times). All told, these 24 instances of leave total 613.6 hours, averaging out to 25.57 hours apiece. Using its flawed methodology, KCS charged Berberich with using 0.83 weeks (25.57 hours per leave divided by 30.9 average hours worked per week), on average, for each instance of leave.

      61.     When Berberich marked off for FMLA leave, KCS deducted each clock hour in which Berberich was marked off from his FMLA-leave allotment, rapidly draining his leave

allotment. To see this, look closely at two sets of dates on the spreadsheet: August 28-29, 2021, and October 2-3, 2021.

62.     The data for August 28 is in the fifth row of the spreadsheet. It shows that Berberich marked off—or, in railroad parlance, "laid off"—for FMLA leave at 12:13 a.m. that day.[7] According to KCS, that leave lasted 34 hours and 14 minutes. That means that this leave alone accounted for *1.1 weeks* of FMLA leave (34 hours divided by 30.9), or almost 10 percent of Berberich's entire annual allotment of FMLA leave.

63.     But this leave did not last for 1.1 weeks. It lasted for less than a day and a half. The next row on the chart—the one for August 29—shows this. On that day, Berberich again marked off for FMLA leave, this time at 5:47 p.m. (or 17:47). He could not have marked off for leave that day—nor for several more days after August 29—if the leave he took on August 28 had in fact spanned more than a calendar week. But it did not. It lasted 34 hours and 14 minutes, from 12:13 a.m. on August 28 until 10:27 a.m. on August 29, at which point Berberich marked back up only to mark off for FMLA leave again later that afternoon. Those two days of leave should have counted for just that—two days of leave—not more than a week.

64.     The same thing happened on October 2 and 3. Berberich marked off for FMLA leave at 10:57 a.m. on October 2. That leave lasted for exactly 24 hours. Berberich took another 24 hours off beginning at 3:13 p.m. (15:13) on October 3. Each of those days cost Berberich 0.78 *weeks* of leave (24 hours divided by 30.9). For that to be possible, Berberich would have had to have taken *several* days of leave. But he didn't; he took *one*. The upshot is clear: KCS calculated the amount of FMLA leave Berberich took by counting the amount of time on the clock he was

---

[7] The third column in the spreadsheet, titled "LAYOFF TM," shows that the time at which Berberich laid off on August 28 was 0:13, or 12:13 a.m. *Id.*

marked off for that leave, treating 24 hours of clock time as 24 hours of FMLA leave, thereby hugely inflating the amount of leave Berberich took. And on top of that, KCS deducted more than a week's worth of leave from Berberich's leave allowance for leave that Berberich took during a single week. The FMLA does not permit KCS to do these things.

65. If this weren't enough, there are yet more problems with KCS's calculations of Berberich's FMLA leave. KCS determined that Berberich was entitled to 371 hours of FMLA leave solely by reference to the number of hours that it says Berberich worked. KCS claimed that Berberich worked 1606.5 hours in the prior year, according to the spreadsheet Byers included in her letter to Berberich explaining KCS's calculations:

| Employee Number | Employee Last Name | Employee Initials | Class of Time Code | Class of Time Description | Hours |
|---|---|---|---|---|---|
| 000074369 | BERBERICH | JM | 15 | DEADHEAD S&A | 12.92 |
| | | | 20 | STRAIGHT TIME | 1,546.33 |
| | | | 22 | OVERMILES | 4.92 |
| | | | D1 | DOG-CATCH BASIC DAY | 24.00 |
| | | | OA | OVERTIME AFTER 12 HOURS | 18.35 |
| | | | Sum: | | 1,606.52 |

66. The problem is that KCS cannot calculate the amount of leave to which employees are entitled solely by reference to the amount of work employees have done in the 12-month period prior to when their leave would commence. That sum also must include hours that would have been worked but for taking any leave, including FMLA leave, during that period. 29 C.F.R. § 825.205(b)(3) (directing employers to derive employees' leave entitlement based on "a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (*including any hours for which the employee took leave of any type*)") (emphasis added). KCS does not follow this directive. Berberich took FMLA leave during the 12-month period in which KCS says that Berberich worked 1606.5 hours. Berberich Decl. Ex. A. But the hours he would have worked during periods of leave he took are not included in KCS's calculation of his leave

23

allotment, thereby deflating the amount of leave KCS allotted him. *Id.* The FMLA does not permit that either.

67.     KCS's miscalculations of Berberich's leave continue in other ways, too. KCS's crew management department frequently required Berberich to mark off for FMLA leave for a minimum of 24 hours. Berberich Decl. ¶ 5. The spreadsheet Byers sent to Berberich shows that KCS treated 9 of his 24 instances of leave as being for exactly 24 hours. Berberich Decl. Ex. A. There is no evidence that KCS permitted Berberich to mark off for FMLA leave in any increment even close to one hour—the largest minimum increment of leave permitted under the FMLA. *Id.*; *see* 29 C.F.R. § 825.205(a). The smallest increment of leave Berberich took was for slightly longer than 10 hours—which is already longer than the length of most workdays. Berberich Decl. Ex. A. By forcing Berberich to mark off for longer periods than he needed, KCS further unlawfully deprived him of his 12 weeks of leave.

68.     Berberich's experience was typical. Since changing its leave-calculation methodology, KCS has informed many employees—including all Plaintiffs—that their FMLA leave has been exhausted. Roberson Decl. ¶ 8; Hudson Decl. ¶ 8; White Decl. ¶ 8; Schmitt Decl. ¶ 8; Berberich Decl. ¶ 9; Ulrich Decl. ¶ 9; Collins Decl. ¶ 8. Other Plaintiffs and class members have received letters from Byers containing the same methodology and the same sorts of spreadsheets offered in support of KCS's methodology. Roberson Decl. Ex. A; Hudson Decl. Exs. B, E; Schmitt Decl. Ex. D. These letters and spreadsheets purporting to document Plaintiffs' and class members' FMLA leave all suffer from the same flaws. To take just one more example, consider the case of Plaintiff Caleb Schmitt.

69.     Byers claimed that Schmitt worked 1,254 hours in the prior 12-month period, which worked out to be an average of 24 hours a week. Schmitt Decl. Ex. D. (This is actually 24.12 hours

24

a week, but Byers rounded down.) Multiplying 1,254 by 12 and dividing by 52 yielded 289 hours

of FMLA leave available to Schmitt. (The actual number is 289.38, but Byers again rounded

down.) Byers then claimed that Schmitt had already taken 807 hours of FMLA leave during the

relevant 12-month period, far exceeding his 289-hour allotment. But KCS's calculations of

Schmitt's FMLA leave suffered from the same methodological flaws documented above.

70.     First, as it did with Berberich, KCS determined that Schmitt was entitled to 289

hours of leave solely by reference to the number of hours that it says Schmitt worked. Those

amounted to just under 1,254, as the spreadsheet Byers sent to Schmitt shows:

| Employee Number | Employee Last Name | Employee Initials | Class of Time Code | Class of Time Description | Hours |
|---|---|---|---|---|---|
| 000201700 | SCHMITT | CJ | 15 | DEADHEAD S&A | 54.75 |
| | | | 20 | STRAIGHT TIME | 1,109.75 |
| | | | 37 | INVESTIGATION | 31.57 |
| | | | 39 | RULES OR TRAINING CLASSES | 16.00 |
| | | | D1 | DOG-CATCH BASIC DAY | 24.00 |
| | | | OA | OVERTIME AFTER 12 HOURS | 17.88 |
| | | | Sum: | | 1,253.95 |

71.     But calculating Schmitt's leave allotment only by reference to hours worked

violates the FMLA because it fails to include hours Schmitt would have worked during the leave

that Schmitt took during the relevant 12-month period. That unlawfully reduced the amount of

leave Schmitt should have had available to him.

72.     Next, just as it did with Berberich, KCS egregiously overcounted the leave that it

says Schmitt actually took. Byers claimed that Schmitt had taken 807 hours of leave and attached

a spreadsheet to support KCS's calculations:

| EMPLOYEE | LAYOFF DT | LAYOFF TM | DURATION HRS | DURATION MIN | STATUS CD | REASON CD | CATEGORY | STATION | BOARD | CREW | POS | Station Name | Name | 12 months rolling |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000201700 | 3/13/2021 | 4:56:00 PM | 23 | 32 | LV | IS | W | 128 | PPS | PS88 | CON | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201700 | 3/14/2021 | 4:28:00 PM | 48 | 0 | LV | IS | W | 128 | PPS | PS88 | CON | Pittsburg | SCHMITT, CALEB J | 1 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000201 700 | 4/2/2021 | 5:56:0 0 PM | 71 | 10 | LV | IS | H | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 4/25/202 1 | 7:28:0 0 PM | 24 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 5/3/2021 | 10:24:0 0 AM | 24 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 5/15/202 1 | 11:49:0 0 PM | 23 | 35 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 5/15/202 1 | 12:16:0 0 AM | 23 | 33 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 5/16/202 1 | 11:24:0 0 PM | 24 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 6/7/2021 | 8:57:0 0 AM | 24 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 6/8/2021 | 8:57:0 0 AM | 23 | 47 | LV | IS | P | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 6/9/2021 | 8:44:0 0 AM | 24 | 0 | LV | IS | P | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 6/19/202 1 | 12:34:0 0 AM | 48 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 7/2/2021 | 1:16:0 0 AM | 72 | 0 | LV | IS | W | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 7/14/202 1 | 3:15:0 0 PM | 23 | 48 | LV | IS | P | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 000201 700 | 7/15/202 1 | 3:03:0 0 PM | 24 | 0 | LV | IS | P | | 128 | PPS | P S 88 | C O N | Pittsburg | SCHMITT, CALEB J | 1 |
| 00002017 0 | 7/24/202 1 | 1:15:00 PM | 24 | 0 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/6/2021 | 2:34:00 PM | 23 | 58 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/7/2021 | 2:32:00 PM | 23 | 7 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/8/2021 | 1:40:00 PM | 19 | 16 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/17/202 1 | 4:26:00 AM | 24 | 0 | LV | I S | P | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/20/202 1 | 8:03:00 PM | 47 | 30 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
| 00002017 0 | 8/22/202 1 | 7:33:00 PM | 24 | 0 | LV | I S | W | | 128 | PPS | PS8 8 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |

26

| 00020170 0 | 10/17/20 21 | 12:50:00 PM | 24 | 0 | LV | I S | W | 128 | PPS | PS0 2 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00020170 0 | 11/3/202 1 | 9:23:00 AM | 23 | 37 | LV | I S | P | 128 | PPS | PS0 2 | CO N | Pittsbur g | SCHMITT, CALEB J | 1 |

73.     The spreadsheet records 24 instances of leave taken from March 13, 2021, to November 3, 2021.[8] Almost every instance of leave KCS says Schmitt took during this time is close to a multiple of 24, i.e., 24, 48, or 72. The lone instance in which this is not the case is a leave of 19 hours and 16 minutes begun on August 8, 2021, which is also the shortest period of leave that KCS attributes to Schmitt during this period. All told, these 25 stretches of leave (including the one KCS says Schmitt took on November 11) add up to 807 hours of leave, averaging out to 32.28 hours per leave period. Using its flawed methodology, KCS charged Schmitt with using 1.345 weeks (32.28 hours per leave divided by 24 hours worked per week), on average, for each instance of leave. In other words, KCS claims that, on average, Schmitt used *more than a week's worth of FMLA leave each time* that he took FMLA leave.

74.     As with Berberich, KCS calculated Schmitt's FMLA leave by adding up all the clock hours he was marked off for that leave. And here, too, KCS regularly deducted more than a week's worth of FMLA leave from Schmitt's leave allowance for leave that Schmitt's took within a single week. It's also clear that KCS did not calculate this leave in the smallest allowable increment of time. Schmitt marked off for FMLA leave on successive days on several occasions: March 13 and 14; May 15 and 16; June 7, 8, and 9; July 14 and 15; and August 6, 7, and 8. KCS treated Schmitt as using roughly 24 hours of leave on each of these days. That translates to a full

---

[8] A separate one-line spreadsheet that Byers sent Schmitt in her letter explaining KCS's calculations states that Schmitt had marked off 25 times from March 13, 2021 to November 11, 2021.

| EMPLOYEE | Name | Initial Layoff | Most Recent Layoff | # of Layoffs | Total Hours | Total Min | Total Layoff |
|---|---|---|---|---|---|---|---|
| 000201700 | SCHMITT, CALEB J | 3/13/2021 | 11/11/2021 | 25 | 800 | 406 | 807 |

It appears, then, that the spreadsheet Byers sent Schmitt recording each instance of leave left out the leave Schmitt took on November 11.

27

*week of FMLA leave each day*, since KCS anchored its determination of Schmitt's total FMLA leave allowance by claiming that he worked an average of 24 hours each week.

75.     Take March 13 and 14, for example. Schmitt marked off for leave at 4:56 p.m. on March 13. KCS says that leave lasted for 23 hours and 32 minutes, which KCS counts as nearly a week of FMLA leave. But that leave did not last for a week; it lasted for precisely 23 hours and 32 minutes. KCS says that Schmitt took another 48 hours of leave—which KCS counts as *two weeks* of FMLA leave—beginning at 4:28 p.m. on March 14. The length of time between 4:56 p.m. on March 13 and 4:28 p.m. on March 14? Twenty-three hours and 32 minutes.

76.     Or take May 15. Schmitt first marked off for leave at 12:16 a.m. that day. This leave lasted 23 hours and 33 minutes—which, again, KCS counts as nearly a week of leave for purposes of the FMLA. But Schmitt then marked off for FMLA leave *a second time* that day, starting at 11:49 p.m., and this leave lasted 24 hours. The length of time between 12:16 a.m. and 11:49 p.m. is 23 hours and 33 minutes—the exact amount of time KCS attributes to the first stretch of leave Schmitt took on May 15. The only way KCS could have come up with that number is by treating every hour Schmitt was marked for FMLA leave *as* an hour of FMLA leave. But Schmitt obviously did not take a week of leave on May 15. He took no more than a day of leave.

77.     Plaintiffs provide these examples to give this Court detailed, step-by-step insight into how KCS miscalculates FMLA leave. But KCS applies the same FMLA policies to every plaintiff. Roberson Decl. ¶ 11; Hudson Decl. ¶ 11; White Decl. ¶ 11; Schmitt Decl. ¶ 11; Berberich Decl. ¶ 11; Ulrich Decl. ¶ 13; Collins Decl. ¶ 10; Prewitt Decl. ¶ 6. When KCS changed its methodology for calculating FMLA leave, it did so on a companywide basis. Roberson Decl. ¶ 11; Hudson Decl. ¶ 11; White Decl. ¶ 11; Schmitt Decl. ¶ 11; Berberich Decl. ¶ 11; Ulrich Decl. ¶ 13; Collins Decl. ¶ 10; Prewitt Decl. ¶ 6. And KCS has applied that common methodology to

28

Berberich, Schmitt, the other Plaintiffs, and the rest of its workforce, uniformly miscalculating their leave and denying them the leave they are entitled to. *See, e.g.*, Prewitt Decl. ¶ 6.

## PLAINTIFFS AND SIMILARLY SITUATED EMPLOYEES SUFFER ADVERSE CONSEQUENCES BECAUSE OF KCS'S UNLAWFUL CONDUCT

78.     KCS has put its employees in an impossible bind. Employees who need FMLA leave but whom KCS wrongfully alleges have exhausted that leave have two bad options. They must either work through periods when they need and would otherwise take FMLA leave or they must take unprotected sick or personal leave, risking their jobs. Whatever path they choose, the consequences are profound.

79.     For KCS employees who have been denied FMLA leave for their own serious medical conditions, continuing to work can be hazardous, painful, and embarrassing. Hudson Decl. ¶ 10; Schmitt Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 12; Collins Decl. ¶ 9; Prewitt Decl. ¶ 8. Plaintiffs Hudson and Berberich, for example, have had to work even when suffering debilitating headaches. Hudson Decl. ¶ 10; Berberich Decl. ¶ 10. This experience is extremely painful. Hudson Decl. ¶ 10; Berberich Decl. ¶ 10. The same is true for Plaintiff Ulrich, who experiences intense pain in his foot during gout outbreaks. Ulrich Decl. ¶ 12. Plaintiff Schmitt has worked as a conductor through acute episodes of ulcerative colitis. Schmitt Decl. ¶ 10. Plaintiff Collins has worked with kidney pain so acute it feels like he's being stabbed. Collins Decl. ¶ 9. All of these Plaintiffs would have taken FMLA leave rather than work through these crises had KCS not miscalculated their leave. Hudson Decl. ¶ 10; Schmitt Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 12; Collins Decl. ¶ 9.

80.     KCS employees and their families are damaged in other ways, too. Without the FMLA's protections, Plaintiff Berberich cannot adequately care for his elderly parents. Berberich Decl. ¶¶ 3, 11. Other employees improperly denied FMLA leave—including Plaintiffs White and

29

Schmitt—have lost or will lose the opportunity to bond with newborn children. White Decl. ¶¶ 3, 11; Schmitt Decl. ¶¶ 3, 10-11; Prewitt Decl. ¶ 8. As any new parent can attest, these are once-in-a-lifetime experiences that cannot be replaced. White Decl. ¶ 3; Schmitt Decl. ¶ 11. Others have lost the ability to care for ailing spouses and children. White Decl. ¶ 3; Prewitt Decl. ¶ 8.

81.     On the other side of the ledger, employees who mark off for sick days or personal days—when they would otherwise take FMLA leave—to attend to their family or medical needs risk discipline and termination. Roberson Decl. ¶¶ 3, 10; Hudson Decl. ¶¶ 3, 10; White Decl. ¶¶ 3, 10; Schmitt Decl. ¶¶ 3, 10; Berberich Decl. ¶¶ 3, 10; Ulrich Decl. ¶¶ 3, 12; Collins Decl. ¶¶ 3, 9; Prewitt Decl. ¶ 8. Plaintiff Roberson had no choice but to use sick leave to attend to his U.S. military combat-related injuries. Roberson Decl. ¶ 10. KCS charged him with using excessive leave and summarily terminated him. *Id.* Plaintiff Hudson has marked off sick on a handful of occasions where his condition was simply too severe to permit him to work. Hudson Decl. ¶ 10. He describes doing so as a "gamble," since KCS could discipline him at any point for taking such leave. *Id.* KCS is currently investigating Hudson for supposed attendance violations. *Id.* After KCS denied Plaintiff White any additional FMLA leave, KCS terminated him for taking what it deemed to be excessive sick and personal leave. White Decl. ¶ 10. White took sick leave once to help his daughter with her hernia surgery; another time to have teeth removed; and another time yet when he suspected he'd contracted COVID-19. *Id.* KCS investigated White on February 15, 2022 and terminated him a week later. *Id.* Plaintiff Schmitt has used sick leave on a handful of occasions to attend to his own medical condition. Schmitt Decl. ¶ 10. Although he hasn't been disciplined yet, Schmitt's supervisor warned him that he's "close to an investigation." *Id.* Translation: use any more sick leave and Schmitt will face discipline. *Id.* Plaintiff Berberich has also used sick leave on a handful of occasions since he was denied FMLA leave. Berberich Decl. ¶ 10. Every time he

30

has to miss work brings "fear and anxiety" that he'll lose his job. *Id.* Plaintiff Ulrich is in the same boat. Ulrich Decl. ¶ 12. He has marked off sick on a few occasions to deal with his pancreatitis and gout. *Id.* He has not faced discipline yet. But he is afraid of being "written up, investigated, or even terminated." *Id.* Plaintiff Collins has needed to use sick leave on occasion. Collins Decl. ¶ 9. He, too, fears for his job. *Id.* None of this would have happened had KCS not miscalculated Plaintiffs' FMLA leave and improperly denied them leave.

## CLASS ALLEGATIONS

82.     Plaintiffs bring FMLA claims against KCS pursuant to Federal Rule of Civil Procedure 23, seeking injunctive, declaratory, and other equitable relief, along with back pay and other monetary and compensatory relief, on behalf of themselves and the following class:

> Current, future, and former KCS employees who have worked enough hours to be eligible for FMLA leave who, at any time from three years preceding the complaint's filing to the resolution of this action, took or attempted to take FMLA leave.

> Plaintiffs reserve the right to revise this class definition based on discovery or other legal developments.

83.     Class treatment is appropriate because the class is so numerous that joinder of all members is impracticable. The exact number within the class is unknown, but it may be determined from records maintained by KCS.

84.     Class treatment is appropriate because there are questions of law or fact common to the class, including the following:

a.      whether KCS's companywide policy or practice of calculating FMLA leave violates the FMLA;

b.      whether KCS's companywide policy of moving individuals to the back of the on-call list upon return from FMLA leave violates the FMLA; and

c.      whether monetary damages, injunctive relief, and other equitable remedies

31

are warranted.

85.     Class treatment is appropriate because KCS will raise common defenses to the claims.

86.     Class treatment is appropriate because Plaintiffs' claims are typical of the class's claims, and Plaintiffs will fairly and adequately protect the class's interests.

87.     Class treatment is appropriate because Plaintiffs have retained counsel who are competent, experienced in litigating class actions, and will effectively represent the interests of the class.

88.     Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for KCS and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

89.     Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(2) because KCS has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

90.     Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

91.     Class treatment is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## FIRST CAUSE OF ACTION: FMLA INTERFERENCE/ENTITLEMENT
### *(On behalf of Plaintiffs and the proposed class)*

92.     Congress enacted the FMLA in 1993 to accommodate "the important societal interest in assisting families, by establishing a minimum labor standard for leave." *Churchill v. Star Enters.*, 183 F.3d 184, 192 (3d Cir. 1999) (quoting S.Rep. No. 103-3 at 4, 1993 U.S.S.C.A.N. at 6-7). In enacting the FMLA, Congress sought "(1) to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity; [and] (2) to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse or parent who has a serious health condition." 29 U.S.C. § 2601(b)(1), (2).

93.     To accomplish these goals, the FMLA grants an "eligible employee" the right to 12 workweeks of leave over any 12-month period for, among other things, "the birth of a son or daughter," "a serious health condition that makes the employee unable to perform the functions" of the employee's position, or the "care [of a] spouse, or a son, daughter, or parent." *Id.* § 2612(a)(1). After a period of qualified leave, an employee is entitled to reinstatement to his former position or an equivalent position with "equivalent employment benefits, pay and other terms and conditions of employment." *Id.* § 2614(a)(1). The taking of FMLA leave, "shall not result in the loss of any employment benefit accrued prior to the date on which leave commenced." *Id.* § 2614(a)(2). Nor can the taking of FMLA leave be used as a negative factor in employment actions. 29 C.F.R. § 825.220(c). In some cases, employees may take a single period of FMLA leave to attend to their or their loved ones' discrete serious medical conditions. *E.g.*, 29 U.S.C. §

33

2612(a)(1)(A). However, the FMLA also provides for "intermittent" leave, which allows an employee to take FMLA leave intermittently, "when medically necessary," such as to attend appointments with a health care provider for necessary treatment of a serious health condition. *Id.* § 2612(b); 29 C.F.R. § 825.117 (defining requirements for intermittent leave).

94.     The FMLA and Department of Labor regulations give employers four ways for "determining the 12-month period in which the 12 weeks of leave entitlement…occurs." 29 C.F.R. § 825.200(b), (d). Employers may use the calendar year, any fixed 12-month period, a non-fixed "12-month period measured forward from the date any employee's first FMLA leave," or "[a] 'rolling' 12-month period measured backward from the date an employee uses any FMLA leave." *Id.* § 825.200(b). KCS uses the last method. Under KCS's FMLA policy, "[t]he amount of leave for which an employee is eligible is determined on a rolling 12-month period looking backward." Hudson Decl. Ex. C. This means that "each time an employee takes FMLA leave the remaining leave entitlement would be any balance of the 12 weeks which has not been used during the immediately preceding 12 months." 29 C.F.R. § 825.200(c).

95.     Regardless of which method is used, though, employers must count employees as using an amount of leave in direct proportion to the amount of work they miss because of leave in each workweek. 29 C.F.R. § 825.205(b)(1), (c); 29 U.S.C. § 2612(b)(1). Only the amount of leave actually taken may be counted towards an employee's leave entitlement, and time that an employee is not scheduled to report for work may not be counted as FMLA leave. And employers may deduct no more than one workweek's worth of leave for each week that an employee uses FMLA leave. *See* 29 C.F.R. § 825.205(b)(1). Further, employers may not require employees to take more FMLA leave than necessary, and they must permit employees to take such leave in increments of one hour

34

or less. *Id.* § 825.205(a)(1).[9] In addition, when, as here, employees work variable and irregular schedules, employers must calculate the amount of FMLA leave an employee has available based on two things: the amount of time the employee worked in the 12-month period preceding the leave request and the amount of time the employee would have worked but for taking leave time (of any type) during that period. *See id.* § 825.205(b)(3).

---

[9] A separate provision of the regulations provides that "[w]here it is physically impossible for an employee using intermittent leave or working a reduced leave schedule to commence or end work mid-way through a shift, such as where a flight attendant or a railroad conductor is scheduled to work aboard an airplane or train, … the entire period that the employee is forced to be absent is designated as FMLA leave and counts against the employee's FMLA entitlement." *Id.* § 825.205(a)(2). This regulation embraces the commonsense principle that an employer can charge an employee with missing an entire *shift* of work when the nature of the work makes a single shift functionally indivisible. The phrase "entire period that the employee is forced to be absent" thus refers back to the "shift." *Id.* A flight attendant, after all, cannot miss the first two hours of an 8-hour flight and then join the plane midway through the trip. But this regulation has no application here. Plaintiffs and class members do not have scheduled shifts; they are called on to perform work as it becomes available. They therefore are not "absent" from a shift they are "scheduled to work…aboard a train" when they mark off for FMLA leave. *Id.* Nor does marking off for FMLA leave cause them to "commence or end work mid-way through a shift." *Id.* To the contrary, when Plaintiffs and class members mark back on after concluding their leave, they are called into work when they are at the top of the on-call board, and then they work a full shift. That is how on-call work functions. This regulation, then, does not apply to on-call employees like Plaintiffs and class members, but even if it did, it would not permit KCS to presume that an employee would work 24-7 through a period of FMLA leave just because some of the work that would be performed during the leave would be indivisible. Such a reading would defy reality; no employee works 24-7. It also would defy the law: train employees are not allowed to work more than 12 consecutive hours or to begin a shift until they have had at least 10 consecutive hours off duty within the past 24 hours. 49 U.S.C. § 21103(a)(1)-(2). Along the same lines, train employees generally may not work more than 6 or 7 days in a row. *Id.* § 21103(4). Reading § 825.205(a)(2) to permit what KCS is doing would also run afoul of *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). KCS's methodology charges an employee who works 40 hours a week with using *one full week* of FMLA leave after he marks off for *40 hours* (i.e., one day and 16 hours) of FMLA leave. KCS's methodology also charges the same hypothetical employee who marks off for exactly one week (or 168 consecutive hours) with using *4.2 weeks* of FMLA leave (168/40). It would not be a permissible interpretation of the statute to consider a week off for FMLA leave to count as 4.2 weeks.

96.     KCS's methodology for calculating FMLA leave violates each of these rules. First, by counting every hour in which an employee marks off to take FMLA leave as an hour of FMLA leave, and by regularly deducting more than one workweek's worth of leave for each week that an employee uses FMLA leave, KCS hugely inflates the amount of FMLA leave that its employees use. A great deal of this time simply cannot be counted as FMLA leave. Second, KCS often forces employees to mark off for periods of FMLA leave that are both far longer than an hour and far longer than what employees need. Third, KCS undercounts the amount of time employees have worked in determining their FMLA-leave allotment. And fourth, when calculating the amount of FMLA leave employees are entitled to, KCS fails to account for time employees would have worked but for taking leave.

97.     The illegal ways in which KCS calculates FMLA leave work together to penalize employees who need and rely upon the FMLA. Employees are allotted fewer hours of annual leave than they should receive, and any FMLA leave they take is overcounted by several orders of magnitude against that original (and already flawed) allotment.

98.     So how *should* KCS calculate FMLA leave to comply with the FMLA? Plaintiffs do not foreclose the possibility that there may more than one permissible methodology. *Cf.* 29 C.F.R. § 825.200(b), (d) (setting out four ways of establishing the relevant 12-month period). But Plaintiffs suggest that any permissible calculation must embrace the following four basic steps.

99.     The first step is accurately calculating each employee's annual leave allotment. To do this, KCS must (1) determine the average number of hours that each employee worked, per week,[10] during weeks—and only during such weeks—when (a) the employee was employed for

---

[10] The FMLA does not define the term "workweek." 29 U.S.C. § 2612(a)(1). But KCS could choose any fixed and regularly recurring period of 168 hours—for example, midnight Sunday to

the entire week and (b) the employee took no forms of leave[11] during that week; then (2) multiply the resulting figure by 12.[12] This step, in essence, determines how much time an employee works in a *standard week of work*, then multiplies that figure by 12. In performing this calculation, KCS must count all work time that is compensable under the FLSA. 29 C.F.R. § 825.110(c).[13] These calculations are straightforward: if employee Smith worked 35 total weeks (in the relevant 12-month period) during which he took no leave, and Smith worked 1,400 hours during those weeks (averaging 40 hours per week), then Smith's total allotment of FMLA leave would be 480 hours (1,400 / 35 * 12).

100.    The second step is allowing employees to take FMLA leave in the minimum legal increment of one hour or less. *See* 29 C.F.R. § 825.205(a)(1). This step ensures that KCS cannot unlawfully force employees to take more FMLA leave than they need.

101.    The third step is depleting employees' FMLA leave allotment based on the amount of work employees miss because of taking FMLA leave. One way to do this (and the way Plaintiffs

---

midnight Sunday—to constitute a workweek. *Cf.* 29 C.F.R. § 778.105 (determining the workweek under the FLSA).

[11] Leave includes FMLA leave, personal leave, sick leave, vacation, and other similar forms of leave. Leave does not include time employees are marked up and waiting to work. Nor does leave include time employees are marked up but on mandatory rest periods.

[12] This analysis assumes that KCS would continue using the 12-month rolling method to determine the allotment. 29 C.F.R. § 825.200(b), (d). But the same basic principles apply regardless of which method KCS chooses to determine the relevant 12-month period.

[13] Looking exclusively to weeks where the employee took no form of leave complies with 29 C.F.R. § 825.205(b)(3), which directs employers to derive employees' leave entitlement based on "a weekly average of the hours scheduled over the 12 months prior to the beginning of the leave period (including any hours for which the employee took leave of any type)." Plaintiffs' proposed methodology assumes that for weeks where employees took leave, the additional amount of time the employee *would have worked* but for taking leave is the difference between the number of hours he actually worked that week and the average number of hours he worked during weeks where no leave was taken. Here is an example. Employee Smith works 40 hours a week, on average, during weeks where no leave is taken. During a week where Smith marked off for 48 hours of leave, he actually worked for 30 hours. Plaintiffs' methodology therefore assumes that Smith would have worked an additional 10 hours that week had he not taken any leave.

propose in their motion for a temporary restraining order) is by (1) reducing the employee's FMLA leave allotment by the difference in hours between (a) the amount of time the employee actually worked in any workweek where an employee marked off for FMLA leave and (b) the average amount of time the employee works in a standard workweek;[14] then (2) prorating the difference, if necessary, if the employee took multiple forms of leave in a single workweek. So, for example, if employee Smith works 40 hours per week in a standard workweek, and if he marks off for FMLA leave for 24 hours in a workweek and works 35 hours during that workweek, then Smith would be charged with using 5 hours (calculated as 40 minus 35) of FMLA leave during that workweek. And if in the next workweek Smith marks off for FMLA leave for 24 hours, marks off for vacation for 24 hours, and works 30 hours during that workweek, then Smith would similarly be charged with using 5 hours (calculated as (40 - 30) / 2) of FMLA leave during that workweek. Smith worked ten hours less that week than normal, but half of that difference is attributed to his vacation, half to his FMLA leave.

102.    The fourth step is restoring employees to their place in the on-call line at the conclusion of their FMLA leave. This is very straightforward. If employee Smith was 12th in line on the on-call list when he marked off for FMLA leave, then KCS should restore Smith to the 12th-in-line position when Smith returns from FMLA leave and marks back up.

---

[14] The standard workweek would need to be prorated in the case of any partial workweeks at the very beginning or end of the 12-month look-back period. For example, if the relevant 12-month look-back period began with the last four days of a workweek, then FMLA leave would be measured by the difference between the number of hours the employee actually worked during those four days and the number of hours the employee works in a standard workweek, multiplied by four and divided by seven.

38

103.     Getting these calculations right matters.[15] Plaintiffs (and many other KCS employees) would still have FMLA leave available to use but for KCS's miscalculations. As a result of these unlawful practices, a significant number of KCS's employees are prohibited from taking the FMLA leave to which they are entitled. KCS wrongly declares that employees have exhausted their FMLA leave and denies them leave that they need, would use, and are entitled to. The consequences for employees are extraordinary. Wrongfully deprived of FMLA-protected leave, KCS's employees are put in an impossible position: they must either take unprotected sick or personal leave, risking discipline and termination, or they must go without leave altogether. Those who forgo leave are forced to work through serious illnesses, made to miss out on the opportunity to form meaningful early experiences with their children, and deprived of the chance to care for their sick loved ones. On the other hand, employees who are forced to take unprotected sick or unpaid personal days—that is, employees who miss work after KCS claims that their FMLA leave has been exhausted—are promptly disciplined and eventually terminated by KCS.

104.     KCS is a covered employer under the FMLA, as it engages in commerce or in an industry affecting commerce and employs far more than 50 employees. Prewitt Decl. ¶ 3.

105.     Plaintiffs and class members are eligible for FMLA leave. They have been employed by KCS for at least 12 months, and they work at least 1,250 hours in each 12-month rolling period that KCS looks to when calculating leave. Roberson Decl. ¶ 2; Hudson Decl. ¶ 2; White Decl. ¶ 2; Schmitt Decl. ¶ 2; Berberich Decl. ¶ 2; Ulrich Decl. ¶ 2; Collins Decl. ¶ 2. They work in an area where KCS employs 50 or more employees within a 75-mile radius. Prewitt Decl.

---

[15] Plaintiffs provide this Court with a proposed methodology to illustrate how, based on Plaintiffs' understanding of KCS's on-call system, FMLA leave should be calculated. Plaintiffs reserve the right to propose modifications to their proposed methodology based on additional information learned during discovery.

¶ 3. They and their family members suffer from serious health conditions and other conditions that qualify for leave under the FMLA. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 3-4; Collins Decl. ¶ 3.

106.    Plaintiffs and class members have been (or will be) approved for FMLA leave by KCS, and they put KCS on notice of their need for FMLA leave. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 4; Collins Decl. ¶ 3. KCS classified Plaintiffs' and class members' requests for FMLA leave as FMLA leave requests and treated them as such. *See, e.g.*, Berberich Decl. Ex. A; Hudson Decl. Exs. A, B, E. By taking FMLA leave and thereby depleting their total remaining available FMLA leave, Plaintiffs and class members detrimentally relied on KCS's classification of that leave as FMLA leave in exchange for the protections of the FMLA, which KCS has not provided. Roberson Decl. ¶ 3; Hudson Decl. ¶ 3; White Decl. ¶ 3; Schmitt Decl. ¶ 3; Berberich Decl. ¶ 3; Ulrich Decl. ¶ 4; Collins Decl. ¶ 3.

107.    The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the Act]." *See* 29 U.S.C. § 2615(a)(1).

108.    KCS violated this provision of the FMLA. It interfered with, restrained, and denied the exercise or attempted exercise of the protected rights of Plaintiffs and the putative class members when it, among other things, miscalculated the amount of FMLA leave they used, could use, or attempted to use; wrongfully declared that they had exhausted their FMLA leave; charged them with a workplace rule violation and/or assessed points for taking or attempting to take FMLA leave or leave that should have been treated as FMLA leave; removed them from service for the supposed violations; and disciplined and/or terminated them for using or attempting to use FMLA

leave or leave that should have been treated as FMLA leave. KCS also interfered with, restrained, and denied the rights or attempted exercise of the rights of Plaintiffs and putative class members when KCS refused to let them take leave to which they are entitled under the FMLA. KCS discouraged employees from taking or attempting to take FMLA leave, refused to authorize FMLA leave, deterred employees from using FMLA leave, and took other actions to avoid its responsibilities under the FMLA. Plaintiffs and class members have been prejudiced and injured by these violations.

109. KCS's violations of the FMLA are willful and ongoing. Employees, union representatives, and even the third-party company that KCS uses to administer its FMLA program have pointed out that KCS's new calculation methodology does not comply with the FMLA. Roberson Decl. ¶ 10; Hudson Decl. ¶ 10; White Decl. ¶ 10; Schmitt Decl. ¶ 10; Berberich Decl. ¶ 10; Ulrich Decl. ¶ 12; Collins Decl. ¶ 9; Prewitt Decl. ¶ 9; Exhibit A. But KCS has refused to change course, disregarding the FMLA's clear mandates.

110. Because KCS violated the FMLA—and is continuing to violate it—Plaintiffs and the putative class members are entitled to damages for loss of income, including back pay, lost benefits, interest, monetary losses, and front pay, as well as liquidated damages, tax relief, declaratory and injunctive relief, and reinstatement. Plaintiffs and the putative class members are also entitled to attorneys' fees, costs, and interest incurred in connection with these claims.

## SECOND CAUSE OF ACTION: FMLA DISCRIMINATION
### (*On behalf of Plaintiffs and the proposed class*)

111. KCS's policies also discriminate against employees who use FMLA leave. When employees take FMLA leave, KCS reduces their ability to work—and ultimately their wages—through the combined force of two unlawful policies.

41

112.    First, KCS's policy requires its employees to take FMLA leave in increments larger than an hour—and often in increments of 24 hours. Prewitt Decl. ¶ 5; White Decl. ¶ 5; Berberich Decl. ¶ 5. This forced inflation of leave substantially reduces the amount of time an employee is on call and—as a logical consequence—reduces the employee's total work hours and wages. This is a direct violation of the regulations promulgated under the FMLA, which require the employer to "account for the leave using an increment no greater… than one hour." 29 C.F.R. § 825.205(a)(1).

113.    Second, KCS's policy moves employees to the bottom of the on-call list upon their return from FMLA leave. Prewitt Decl. ¶ 5. This both discriminates against individuals who take FMLA leave and denies them benefits to which they are entitled. Employees who take FMLA leave are "entitled, on return from such leave… to be restored by the employer to the position of employment held by the employee when the leave commenced," or "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, *including privileges, perquisites and status.*" 29 C.F.R. § 825.215(a). An equivalent position is also one with similar work hours. For example, "[i]f an employee departed from a position averaging ten hours of overtime (and corresponding overtime pay) each week, an employee is ordinarily entitled to such a position on return from FMLA leave." *Id.* § 825.215(c)(1). "The taking of leave… shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced." 29 U.S.C. § 2614(a)(2). However, nothing in the FMLA requires the restored employee to "the accrual of any seniority or employment benefits during any period of leave" or

"any right, benefit, or position of employment other than [that] which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3).

114.    By requiring employees to take leave in large chunks of time up to 24 hours, and by moving employees who take FMLA leave to the bottom of the on-call list upon their return to work, KCS has substantially reduced the work hours of individuals who take FMLA leave. It has also removed a benefit, perk, or employment status that "accrued prior to the date on which the leave commenced." *Id.* § 2614(a)(2). An employee's place on the on-call list confers "privileges, perquisites and status" because it dictates how soon an employee will be called into work, which in turn substantially impacts their total work hours and take-home pay. 29 C.F.R. § 825.215(a). The reduction in work shifts reduces total work hours and the ability to work overtime and therefore interferes with employees' exercise of FMLA rights to which they are entitled. *See Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 661 (E.D. Pa. 2021) (finding a proposed shift change that would prevent an employee from working overtime would interfere with the exercise of an employee's FMLA rights).

115.    A reduction in work hours also impacts future eligibility for FMLA leave and the total amount of hours of FMLA available going forward, which further interferes with employees' exercise of FMLA rights. The FMLA prohibits not just interference with rights asserted by covered employees but also "manipulation by a covered employer to avoid responsibilities under FMLA." *See* 29 C.F.R. § 825.220. This latter category of violations—actions designed to avoid coverage by the FMLA—includes, for example, "[r]educing hours available to work in order to avoid employee eligibility." *Id.* § 825.220(b)(3).

116.    This substantial reduction in work hours also constitutes a materially adverse employment action that makes out a claim for discrimination under the FMLA. *Rokuson v. Century*

43

*Empire Szechuan Rest. Inc.*, No. 12-CV-1615 WFK, 2015 WL 1542350, at *8 (E.D.N.Y. Mar. 31, 2015); *Cham v. Station Operators Inc.*, 832 F. Supp. 2d 131, 136 (D.R.I. 2011), *aff'd,* 685 F.3d 87 (1st Cir. 2012). KCS must allow its employees to take FMLA leave in one-hour increments and must, at a minimum, restore employees to their previous place on the on-call list upon their return to work.

117. Because KCS violated the FMLA—and is continuing to violate it—Plaintiffs and the putative class members are entitled to damages for loss of income, including back pay, lost benefits, interest, monetary losses, and front pay, as well as liquidated damages, tax relief, declaratory and injunctive relief, and reinstatement. Plaintiffs and the putative class members are also entitled to attorneys' fees, costs, and interest incurred in connection with these claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all class members, pray for relief as follows:

A. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as the representatives of the Class and Subclass, and Plaintiffs' counsel as Class Counsel;

C. An order expunging any discipline and disciplinary points incurred related to the use of FMLA leave or other leave taken that should have been protected FMLA leave from Plaintiffs' and the putative class members' work records, reinstating Plaintiffs and putative class members for whom such discipline resulted in termination, requiring KCS to deem Plaintiffs and class members who were terminated or held out of service as a result of KCS's unlawful FMLA practices to have worked and taken leave at the same rate they did before being terminated so that Plaintiffs and class members remain eligible for FMLA leave upon their reinstatement, and requiring KCS to promote those who were not promoted as a result of its FMLA unlawful practices;

D. An order requiring KCS to pay to Plaintiffs and the putative class members awards for back pay; front pay; wages, salary, employment benefits or other compensation denied or lost; actual monetary losses; interest; and liquidated damages;

44

E.      An order requiring KCS to pay to Plaintiffs and the putative class members an award for costs (including litigation and expert costs), disbursements, interest, tax relief, and attorney's fees;

F.      An order requiring KCS to pay all class representatives an incentive fee;

G.      An order enjoining KCS from miscounting FMLA leave, interfering with, restraining, discrimination against employees who use FMLA leave, or denying employees' use of or attempt to use FMLA leave, and declaring such conduct to be in violation of the FMLA;

H.      Such other relief, including equitable relief, as may be appropriate or that the Court deems just and proper.


                                        COUNSEL FOR PLAINTIFFS AND CLASS
                                        MEMBERS

Date:   May 31, 2022

                                        s/ Steven L. Groves
                                        Steven L. Groves
                                        GROVES POWERS LLC
                                        One U.S. Bank Plaza
                                        505 N. 7th St., Ste. 2010
                                        St. Louis, MO 63101
                                        Phone: (314) 696-2300
                                        Email: sgroves@grovespowers.com

                                        Adam W. Hansen
                                        Email: adam@apollo-law.com
                                        Eleanor Frisch
                                        Email: eleanor@apollo-law.com
                                        APOLLO LAW LLC
                                        333 Washington Avenue North
                                        Suite 300
                                        Minneapolis, MN 55401
                                        Phone: (612) 927-2969
                                        (*admission pro hac vice forthcoming*)

                                        Colin Reeves
                                        APOLLO LAW LLC
                                        1000 Dean Street, Suite 101
                                        Brooklyn, NY 11238
                                        Phone: (646) 363-6763
                                        Email: colin@apollo-law.com

(*admission pro hac vice forthcoming*)

Nicholas D. Thompson
CASEY JONES LAW
3520 Cherryvale Avenue, Suite 83
Appleton, WI 54913
Phone: (757) 477-0991
Email: nthompson@caseyjones.law
(*admission pro hac vice forthcoming*)